# EXHIBIT B
# (PART 2 OF 4)

Majority Interest made in sufficient time in order for any such increase to be instituted in a timely fashion).

6.7   Authority of the CAO.

Subject to the direction of the Manager, the CEO and the COO, the CAO shall have the powers and duties over day-to-day administrative matters of the Company usually vested in the office of administrative vice president of a corporation, including, without limitation, supervision of non-managerial staff, and shall have such other powers and duties as may be prescribed by the Manager, CEO or the COO. Such powers shall, in no case, exceed the authority granted under the provisions of this Agreement to the Manager, the CEO or the COO.

6.8   Expenses.

Upon the submission of appropriate documentation, each Member shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred on behalf of, or at the request of, the Company. Officers of the Company shall be paid semi-monthly, in arrears, on the 15th and last day of each calendar month, or the preceding Business Day, in each case, if such days are not Business Days. In addition to the compensation otherwise set forth in this Article 6, the officers of the Company shall be eligible for annual bonuses, payable on December 20th (or the first Business Day thereafter) of each calendar year in such amounts reasonably proposed by the Manager to the Members and approved, if at all, by an affirmative vote of the Members holding at least a Super-Majority Interest. In addition to the provisions of this Article 6, the terms of employment of the initial officers (set forth below in this Article 6), shall be governed by the terms of the employment agreements attached hereto as Exhibit 6.

### ARTICLE 7.
### RIGHTS AND OBLIGATIONS OF MEMBERS

7.1   Limitation of Liability.

Except as otherwise provided by the non-waivable provisions of the Act or by this Agreement, no Member shall be liable for an obligation of the Company solely by reason of being or acting as a Member.

7.2   List of the Members.

Upon written request of any Member made in good faith and for a purpose reasonably related to the Member's rights as Member under this Agreement (which reason shall be set forth in the written request), the Manager shall provide a list showing the names, addresses and Membership Interests of all of the Members, as set

CONFIDENTIAL

forth in Exhibit 18.1. Members shall have no further rights to information under this Section 7.2.

7.3   Members Have No Agency Authority.

Except as expressly provided in this Agreement, the Members (in their capacity as Members) shall have no agency authority on behalf of the Company.

7.4   Company Books.

The Manager shall maintain and preserve, during the term of this Agreement, and for five (5) years after dissolution of the Company, all accounts, books, and other relevant Company documents. Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's expense.

7.5   Priority and Return of Capital.

No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Profits, Losses or Distributions; provided, however, that this Section 7.5 shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

## ARTICLE 8.
## MEETING OF MEMBERS

8.1   Annual Meetings.

The Members shall be required to hold an annual meeting in person (each such meeting an "Annual Meeting"). Each Annual Meeting shall be commenced on the seventh (7th) Business Day of December, beginning in 2010 and repeated for each year thereafter during the Term, and shall continue until all of the business of the Members required at each such Annual Meeting is reasonably concluded. At each Annual Meeting, the Members shall: (a) adopt each respective Budget for the next Fiscal Year in accordance with Article 13, (b) determine and declare Distributions in accordance with Section 11.2, and (c) address any other matters any Member reasonably believes, consistent with the provisions of this Agreement, the Members should address.

CONFIDENTIAL

8.2     Quarterly Meetings

The Members shall be required to hold quarterly meetings during the Term (each a "Quarterly Meeting"). The Quarterly Meetings shall fall respectively on the second Friday (and if not a Business Day, on the next succeeding Business Day) of each respective April, July and October of each year during the Term; provided, however, that there shall be no need for a fourth Quarterly Meeting as all of the business conducted at the Annual Meeting negate the need for a fourth Quarterly Meeting. At each Quarterly Meeting, the Members shall: (a) determine whether any change is required to the Budget and shall enact such change only upon an affirmative vote of the Members holding at least a Super-Majority Interest, (b) determine and declare Distributions in accordance with Section 11.2, and (c) address any other matters any Member reasonably believes, consistent with the provisions of this Agreement, the Members should address.

8.3     Special Meetings.

Either the Manager or any Member holding at least fifteen percent (15%) of the Voting Interests (the "Special Member Meeting Caller") shall have the right to call a meeting of the Members (each such meeting known herein as a "Special Meeting") for the purpose of addressing any matter that this Agreement provides is the proper subject of the attention of the Members.

8.4     Place of Meetings.

Each Member Meeting shall be held at the Principal Place of Business unless the Members holding at least a Super-Majority Interest provide two weeks' Notice to all Members that such Members holding at least a Super-Majority Interest have determined that any Member Meeting shall be held at a location other than the Principal Place of Business whereby such different location shall be the location of the Member Meeting which is the subject of said Notice.

8.5     Notice of Meetings.

With respect to any Special Meeting, except as provided in Section 8.4, the Special Member Meeting Caller shall provide Notice (stating the day and hour of the Special Meeting and the purpose or purposes for which the Special Meeting is called) to each Member entitled to vote at such Special Meeting not less than three (3) nor more than fifty (50) days before the date of the Special Meeting.

CONFIDENTIAL

8.6     Meetings of all Members.

If all of the Members shall meet at any time and place, either within or outside of the State of Nevada, and consent, in writing, to the holding of a Special Meeting at such time and place, such Special Meeting shall be valid without call or notice, and at such Special Meeting lawful action may be taken.

8.7     Record Date.

For the purpose of determining Members entitled to Notice of or to vote at any Member Meeting, or Members entitled to receive payment of any Distribution, or in order to make a determination of Members for any other purpose, the date on which Notice of the meeting is mailed or the date on which the resolution declaring such Distribution is adopted, as the case may be, shall be the record date for such determination of Members.

8.8     Quorum.

Members holding at least a Super-Majority Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Voting Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further Notice. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a Notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally Noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Voting Interests whose absence would cause less than a quorum.

8.9     Manner of Acting.

If a quorum is present, the affirmative vote of Members holding at least a Super-Majority Interest shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by this Agreement. Unless otherwise expressly provided herein, Members who have an interest in the outcome of any particular matter upon which the Members vote or consent may vote or consent upon any such matter and their Voting Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter is approved by the Members.

18

CONFIDENTIAL

8.10 <u>Proxies</u>.

At all meetings of the Members, a Member who is qualified to vote may vote in person or by proxy executed in writing by the Member or by a duly authorized (written power of attorney) attorney-in-fact, accepted in writing by the Manager. Such proxy shall be filed with the Manager before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of the proxy's execution, unless otherwise provided in the proxy.

8.11 <u>Action by Members Without a Meeting</u>.

Action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is evidenced by one or more written consents or approvals describing the action taken and signed by Members holding sufficient Voting Interests, as the case may be, to approve such action had such action been properly voted on at a duly called meeting of the Members. Action taken under this Section 8.11 is effective when Members with the requisite Voting Interests have signed the consent or approval, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

8.12 <u>Waiver of Notice</u>.

When any Notice is required to be given to any Member, a waiver thereof in writing signed by the Person entitled to such Notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

8.13 <u>Manager Participation In Member Meetings</u>.

The Manager shall attend all Member Meetings; provided, however, that the Manager may be temporarily excluded from attendance at the Member Meeting by the Members, through a Majority Vote, with respect to any subject matter wherein the Manager *per se* is the subject of the Member Meeting; provided, however, that the Manager shall be permitted to rejoin the Member Meeting at the immediate conclusion of the discussion and/or vote by Members regarding issues with respect to the Manager *per se*.

CONFIDENTIAL

# ARTICLE 9.
# CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

9.1  <u>Members' Capital Contributions</u>.

As of the Effective Date, each Member shall contribute such amount, in cash or in kind, as is set forth in Exhibit 9.1 hereto as the Member's share of the Initial Capital Contribution (as set forth on Exhibit 9.1).

9.2  <u>Capital Accounts</u>.

A capital account is hereby established for the Members in relation to the Members' respective attributions of capital with respect to the Company (the "Capital Account"). The Capital Account for each Member on a percentage basis shall always be evenly split, to wit: Stephens shall be accorded a fifty percent (50%) Capital Account attribution and Net Sortie shall be accorded a fifty percent (50%) Capital Account attribution. The Members covenant that, as of the Effective Date, the Capital Account shall be valued at ■■■■■■■■■■ ($■■■■■■) with the result being that each of the Members' respective attributions with respect to the Capital Account shall be ■■■ ■■■■■■■■■■■■■■■ ($■■■■■) based further upon the Parties' recognition of contributions and the values associated therewith as set forth on Exhibit 9.1. The Members further covenant that if a new Member is added other than Stephens or Net Sortie, then the treatment of the Capital Account as currently set forth in this Section 9.2 shall require amendment.

# ARTICLE 10.
# RESERVED

# ARTICLE 11.
# ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

11.1  <u>Allocations of Profits and Losses</u>.

The Profits and Losses for each Fiscal Year shall be allocated to each Member on an equal basis.

11.2  <u>Distributions</u>.

11.2.1  The Manager shall distribute all Distributable Cash to the Members on a basis of each Member's Respective Distribution Entitlement by no later than fifteen (15) Business Days after each respective Distribution Meeting.

CONFIDENTIAL

11.2.2 Each Member shall be entitled to Distributions on a pro-rata basis in accordance with each Member's respective Membership Interest (the "Respective Distribution Entitlement").

11.3 Accounting Principles.

For financial reporting purposes, the Company shall use accounting principles applied on a consistent basis using a cash basis method of accounting, unless a different method of accounting for federal income tax purposes is required, in which case that method of accounting shall be the Company's method of accounting.

11.4 Interest on and Return of Capital Contributions.

No Member shall be entitled to interest on the Member's Capital Contribution or the return of the Member's Capital Contribution, except as otherwise specifically provided for herein.

11.5 Accounting Period.

The Company's accounting period shall be the Fiscal Year.

11.6 Records and Reports.

At the expense of the Company, the Manager shall maintain records and accounts of all operations and expenditures of the Company. At a minimum, the Company shall keep at the Principal Place of Business the following records:

(a) a current list of the full name and last known business, residence, or mailing address of each Member and Manager, both past and present;

(b) a copy of the Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c) copies of the Company's federal, state, and local income tax returns and reports, if any, for the four (4) most recent Fiscal Years;

(d) copies of the Company's currently effective written operating agreement, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property or services, and copies of any financial statements of the Company for the three (3) most recent Fiscal Years;

CONFIDENTIAL

(e) minutes of every Member Meeting and court-ordered meeting of the Members; and

(f) any written consents obtained from Members for actions taken by Members without a meeting.

11.7 Returns and other Elections.

11.7.1 The Manager shall cause the preparation and timely filing of all tax returns required to be filed or delivered to the Members by the Company pursuant to the Code, including, without limitation, Internal Revenue Service K-1 forms, and all other tax returns deemed necessary and required in each jurisdiction in which the Company does Business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of each Fiscal Year.

11.7.2 All elections permitted to be made by the Company under federal or state laws shall be made by the Manager in his sole discretion; provided, however, that the Manager shall make any tax election requested by the Members holding at least a Super-Majority Interest.

11.8 Tax Matters Partner.

Unless otherwise determined by the Manager, Net Sortie is hereby designated the Tax Matters Partner ("TMP") as defined in Section 6231(a)(7) of the Code. The TMP and the other Members shall use their reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including any Regulations promulgated thereunder), and, in doing so, shall incur no liability to any other Member.

### ARTICLE 12.
### CONFIDENTIALITY AND NONCOMPETITON

12.1 During the Term, no Member shall Disclose any Confidential Information to any Person, except as necessary in order to conduct the Business.

12.2 While in possession or control of Confidential Information, or any Media embodying same, the Members shall take all reasonable efforts to keep such Confidential Information reasonably inaccessible from Persons who are not otherwise authorized to view the Confidential Information. While in possession or control of any of Company Trade Secrets, or any Media embodying same, the Members shall use the Members' best efforts to keep all Company Trade Secrets inaccessible from Persons who are not authorized to view same. The Members shall not make, or permit or allow

CONFIDENTIAL

to be made, copies of any Media containing, in full or in part, Confidential Information unless such copies are necessary in order to conduct the Business.

12.3   If any Member is requested or required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to Disclose any of the Confidential Information, such Member shall provide the Company with prompt written notice of such request or requirement so that the Company may seek protective orders or other appropriate remedies and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Company, any Member is nonetheless legally compelled to Disclose Confidential Information to any court or tribunal or else would stand liable for contempt or suffer other censure or penalty, such Member may, without liability herein, Disclose to such court or tribunal only that portion of the Confidential Information which the court or tribunal requires such Member to Disclose, provided that such Member exercises such Member's best efforts to preserve the confidentiality of the Confidential Information, including, without limitation, by cooperating with the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information by such court or tribunal.

12.4   Notwithstanding any other provision of this Agreement, the Members hereby acknowledge that the Company owns the exclusive right, title and interest in and to the Company Intangibles embodied in, relating to, based upon or arising from Confidential Information.

12.5   The Members hereby waive any Causes of Action of infringement of any right, title or interest of any Member (whether based on any Intellectual Property right, title or interest, other proprietary interest whatsoever or applicable fiduciary theory) in, to or respecting any Company Confidential Information and agree that the Members shall never challenge nor dispute the Company's right, title and interest in and to Company Confidential Information or Company Intellectual Property.

12.6   During the Term, no Member shall, directly or indirectly, engage in a business that engages in activities within the scope of the Focus (the "Competitive Activities") and shall not, alone or in association with others, own any interest in, manage, operate, control, or be connected in any manner, directly or indirectly, with the ownership, management, operation or control of any entity engaging, in whole or in part, in a business that engages in Competitive Activities within the Restricted Territory, other than by and through the Company, including, without limitation, serving as an agent, associate, Affiliate, consultant, partner, co-venturer, independent contractor or investor of or with any entity or person engaged in the Competitive Activities within the Restricted Territory.

CONFIDENTIAL

12.7     The provisions of this Article 12 shall apply also to any Affiliate of any Member.

## ARTICLE 13.
## BUDGET

The initial Budget, hereby approved by the Members, is set forth in Exhibit 13 and is for the period commencing on the Effective Date and ending December 31, 2010. Thirty (30) days prior to each Distribution Meeting, the Manager shall propose the Budget for the Members with respect to each succeeding relevant period of time. Each Budget must be approved by the Members holding at least a Super-Majority Interest. In the event of a Deadlock, the Budget then in effect shall continue until a new Budget is approved by the Members holding at least a Super-Majority Interest.

## ARTICLE 14.
## RESERVED

## ARTICLE 15.
## TRANSFERABILITY

15.1    General.

15.1.1     Except as otherwise specifically provided herein, no Member shall have the right to Transfer the Member's Membership Interest.

15.1.2     Each Member hereby acknowledges the reasonableness of the restrictions on Transfer and Gift of Membership Interests imposed by this Agreement in view of the Company purposes and the relationship of the Members. Accordingly, the restrictions on Transfer and Gift contained herein shall be specifically enforceable.

15.1.3     No Member shall Pledge any Members' Membership Interest as security for repayment of a liability, and any such Pledge shall be void *ab initio*.

15.2    Right of First Refusal.

15.2.1     Subject to Section 15.3, any Transferring Member which desires to Transfer all or any portion of the Members' Membership Interest to a third party purchaser, including, without limitation, another Member, shall obtain from such third party purchaser ("Third Party Purchaser") a bona fide written offer to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor ("Third Party

24

CONFIDENTIAL

Offer"). The Transferring Member shall give written notification ("Notice of Transfer") to the Company and the other Members who are Members (the "Remaining Members"), by certified mail, of the Transferring Members' intention to so transfer such Membership Interest (the "Offered Interest"). The Notice of Transfer shall be accompanied by a copy of the Third Party Offer. If any portion of the purchase price offered by such third party purchaser consists of consideration other than cash or a promissory note ("Non-cash Consideration"), then: (1) the Notice of Transfer also shall be accompanied by a good faith estimate by the Transferring Member of the fair market value of the Non-cash Consideration, and (2) for purposes of Section 15.2.2 and 15.2.3 the purchase price of the Offered Interest (the "Purchase Price") shall be adjusted as set forth below.

   15.2.1(a)  The Purchase Price shall be decreased by the Non-cash Consideration.

   15.2.1(b)  The Purchase Price shall be increased by an amount equal to either (aa) the Transferring Member's good faith estimate of the fair market value of the Non-cash Consideration ("Transferer's Estimate") or (bb) in the discretion of the Manager, the appraised fair market value of the Non-cash Consideration determined by an independent appraiser selected by the Manager in his sole discretion. The Manager shall have the sole discretion to choose between the amount determined pursuant to clauses (aa) and (bb) of this subsection 15.2.1(b). If the appraised fair market value of the Non-cash Consideration is not determined within twenty (20) days after the Notice of Transfer, then such fair market value shall be equal to the amount of the Transferer's Estimate.

   15.2.2  The Remaining Members shall have the option ("Buy Option") to purchase all, but not less than all, of the Offered Interest, on a pro-rata basis in accordance with the respective Membership Interest of the Remaining Members exercising such option pursuant to this Section 15.2.2 or shall have the option (the "Tag-Along Option") to participate on a pro-rata basis in the terms of the Transfer (even if that Transfer is to another Member) that is the subject of the Notice of Transfer (both the Buy Option and the Tag-Along Option known herein as the "Participation Options"). Either of the Participation Options may be exercised by one or more of the Remaining Members by giving written notification (the "Participation Notice") to the Transferring Member within thirty (30) days after receiving the Notice of Transfer (the "Option Period"). Each Remaining Member which timely gives a Participation Notice electing the Buy Option ("Buying Member") shall purchase such portion of the Offered Interest, pursuant to the timeframes set forth in Section 15.2.3, which is equal to the relative Membership Interest of all of all the Buying Members. If

CONFIDENTIAL

there are no Buying Members, the Buy Option shall terminate and at any time within ninety (90) days following the expiration of the Option Period, and, except as provided in Section 15.3, the Transferring Member shall be entitled to consummate the Transfer of the Offered Interest to the Third Party Purchaser or one or more of the Third Party Purchaser's Affiliates upon terms no less favorable than are set forth in the Third Party Offer; provided, however that each Remaining Member which timely gives a Participation Notice electing the Tag-Along Option ("Tag-Along Member") shall be entitled to and required to effect all transactions at the same time and in the same manner as the Transferring Member.

   15.2.3  If there is at least one Buying Member: (a) the Buying Members shall designate the time, date and place of closing, provided that the date of closing shall be within thirty (30) days after the receipt of the Buy Notice, and (b) at the closing, the Buying Members shall purchase, and the Transferring Member shall Transfer, the Offered Interest for an amount equal to the Purchase Price (as modified in accordance with Section 15.2.1(a) and 15.2.1(b)) and in accordance with such other terms and conditions set forth in the Third Party Offer.

   15.2.4  A Transfer of an Offered Interest pursuant to Section 15.2 shall be subject to Sections 15.3 and 15.4.

15.3  <u>Transfers Not Recognized in Absence of Consent</u>.

   15.3.1  If the Members holding at least a Super-Majority Interest do not approve, in writing, with the Members hereby agreeing to be reasonable in such vote, the proposed Transfer of the Transferring Member's Membership Interest to a transferee, such Transfer shall be null and void *ab initio*, and the transferee shall possess no Membership Interest, Voting Interest or Economic Interest in the Company. Any Gift of a Membership Interest is void *ab initio* absent the written approval of Members holding at least a Super-Majority Interest, and the Members hereby agree to be reasonable in such vote.

   15.3.2  Upon and contemporaneously with any Transfer or Gift authorized hereunder of a Member's Membership Interest, the Transferring Member shall cease to have any residual rights associated with the Membership Interest transferred to the transferee.

CONFIDENTIAL

15.4  **Additional Conditions to Recognition of Transferee.**

    15.4.1      If a Transferring Member Transfers or Gifts a Membership Interest to any Person, authorized hereunder, as a condition to recognizing one or more of the effectiveness and binding nature of such Transfer or Gift (subject to Section 15.3 above), the remaining Members may require the Transferring Member and the proposed successor-in-interest to execute, acknowledge and deliver to the Manager such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Manager may deem necessary or desirable to accomplish any one or more of the following:

    (a)    constitute such successor-in-interest as a Member;

    (b)    confirm that the proposed successor-in-interest to be admitted as a Member, has accepted, assumed and agreed to be subject to and bound by all of the terms, obligations and conditions of this Agreement, as the same may have been further amended;

    (c)    preserve the Company after the completion of such Transfer, Transfer, assignment, or substitution under the laws of each jurisdiction in which the Company is qualified, organized or does Business;

    (d)    maintain the status of the Company as a "partnership" for federal income tax purposes; and

    (e)    assure compliance with any applicable state and federal laws, including securities laws and regulations.

    15.4.2      Any Transfer or Gift of a Membership Interest and admission of a Member in compliance with this Article 15 shall be deemed effective as of the last day of the calendar month in which the remaining Members' consent thereto was given , as provided in this Article 15, above. The Transferring Member hereby indemnifies the Company and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article 15.

27

CONFIDENTIAL

15.5   Change of Control Forfeiture.

If either Stephens or Net Sortie experience a Change of Control (the "Changed Member") without the prior written consent of the other Member (the "Non-Changing Member"), then the Changed Member shall automatically and immediately forfeit all the Changed Member's Membership Interests to the Non-Changing Member and have no further right, title or interest in and to the Company or pursuant to or arising out of this Agreement. Stephens covenants, represents and warrants that as of the Effective Date, Stephens is Controlled by members of the family of Warren A. Stephens and trusts for the benefit of such individuals. Net Sortie covenants, represents and warrants that as of the Effective Date, Net Sortie is Controlled by Gibson.

## ARTICLE 16.
## ISSUANCE OF MEMBERSHIP INTERESTS

From the Effective Date, any Person acceptable to Members holding at least a Super-Majority Interest may become a Member in the Company by the issuance by the Company of Membership Interests for such consideration as the Members holding at least a Super-Majority Interest shall determine, subject to the terms and conditions of this Agreement; provided, however, that Stephens and Net Sortie hereby covenant that in the event of the addition of any new Member, this Agreement shall require amendment for at least the following purposes: accommodating appropriate attributions to the Capital Account, providing for proper treatment of Profits and Losses as well as addressing proper allocations for Distributions.

## ARTICLE 17.
## DISSOLUTION AND TERMINATION

17.1   Dissolution.

17.1.1   The Company shall be dissolved only by the express, written agreement of the Members holding at least a Super-Majority Interest, and notwithstanding anything to the contrary in the Act, the Company shall not be dissolved upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member.

17.1.2   As soon as possible following the occurrence of an agreement specified in Section 17.1.1 effecting the dissolution of the Company, the Manager shall execute all documents required by the Act at the time of dissolution and file or record such statements with the appropriate officials.

28

CONFIDENTIAL

17.2 <u>Effect of Dissolution</u>.

Upon dissolution, the Company shall cease to carry on Business, except insofar as may be necessary for the winding up of the Business, but the Company's separate existence shall continue until winding up and Distribution is completed.

17.3 <u>Winding Up, Liquidation and Distribution of Assets</u>.

    17.3.1 Upon dissolution, the Manager shall promptly proceed to effect the legal cessation of all Business in an orderly manner and in a manner to minimize the creation of any undue liability to any third Person on the part of the Company, the Manager shall promptly take the following further actions in the following order:

    (a) The Manager shall Transfer or otherwise liquidate (to the extent viable) all of the non-cash Company Property as promptly as practicable on the open market and to the extent that the Manager cannot within a reasonable period of time liquidate on the open market all of the non-cash Company Property (the "Remainder"), then the Members shall be provided an equal opportunity to bid (on an open bid basis) on the purchase of any and all of the Remainder until all of the Remainder is liquidated to the successfully bidding Member(s);

    (b) The Manager shall discharge all liabilities of the Company, other than liabilities to Members for Distributions and the return of capital, and establish a reasonable reserve of cash as may be reasonably necessary to provide for contingent liabilities of the Company; and

    (c) The Manager shall then disburse any cash which remains in the Company, after the steps undertaken pursuant to Section 17.3.1(a) and Section 17.3.1(b) are given effect, to the Members on a pro-rata basis in accordance with each Member's respective Membership Interest.

    17.3.2 Upon completion of the procedures winding up, liquidation and Distribution of the assets, the Company shall be deemed terminated.

    17.3.3 The Manager shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final Distribution of the Company's assets.

29

CONFIDENTIAL

17.4 Filing or Recording Statements.

Upon the conclusion of winding up, the appropriate representative of the Company shall execute all documents required by the Act at the time of completion of winding up and file or record such statements with the appropriate officials.

17.5 Return of Contribution Nonrecourse to Other Members.

Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of the Company's Capital Contribution. If the Company Property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Members shall have no recourse against any other Member.

## ARTICLE 18.
## MISCELLANEOUS PROVISIONS

18.1 Notices.

Any notice (a "Notice"), demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served if sent by both certified first class mail, postage prepaid, return receipt requested, and certified first class mail, and addressed or sent to the Member's and/or Company's address, as set forth in Exhibit 18.1. Any Member or the Company may change the respective Member's or Company's address by giving notice in writing to the Company and the other Members of the respective Member's or Company's new address.

18.2 Books of Account and Records.

Proper and complete records and books of account shall be kept or shall be caused to be kept by the COO, in which shall be entered fully and accurately, in all material respects, all transactions and other matters relating to the Business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. The books and records shall at all times be maintained at the Principal Place of Business and shall be open to the reasonable inspection and examination by the Members, the CEO and the Manager during reasonable Business hours.

CONFIDENTIAL

18.3 <u>Business Reports</u>.

Periodically, the COO shall develop regular business reports regarding the operations of the Company, including, without limitation: (a) the number of infringements each month in which action is recommended, (b) the number of infringements each month in which action has been taken, (c) monthly revenues, (d) monthly costs, (e) aged accounts receivable, (f) the number of active infringement cases, (g) the number of new clients in the month, (h) the number of total clients in the month, (i) the number of active copyright registrations held by the Company, (j) the number and nature of resolutions of infringements on a licensed-basis involving the payment of an ongoing royalty, and (k) resolved infringement cases in the month (the "Reports"). The COO shall provide the Reports to the CEO and the Manager on a monthly basis. The COO shall also provide the Reports, as well as any other report of general business activity routinely prepared by the COO in the normal course of business that is intended to be viewed by the Manager in order to create or change the policies or direction of the Company, by way of electronic mail (and each such Member shall advise the COO the most appropriate electronic mail address for such purpose), to each Member holding at least a twenty percent (20%) Membership Interest.

18.4 <u>Application of State Law</u>.

This Agreement, and the application and interpretation hereof, shall be governed exclusively by the Agreement's terms and by the laws of the State of Nevada, and specifically the Act.

18.5 <u>Waiver of Action for Partition</u>.

Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the Company Property.

18.6 <u>Amendments</u>.

This Agreement may be amended only with the written consent of the Members holding at least a Super-Majority Interest and only if such amendment has a proportionate effect on all Members (or in the case of a redemption of Membership Interests or issuance of additional Membership Interests, an amendment which has a proportionate effect on all Members immediately after such redemption or issuance) with respect to their rights to Distributions.

CONFIDENTIAL

CONFIDENTIAL

18.7 Execution of Additional Instruments.

Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

18.8 Effect of Inconsistencies with the Act.

It is the express intention of the Members and the Company that this Agreement shall be the sole source of agreement among them, and, except to the extent that a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. In the event that the Act is subsequently amended or interpreted in such a way to make valid any provision of this Agreement that was formerly invalid, such provision shall be considered to be valid from the effective date of such interpretation or amendment. The Members and the Company hereby agree that the duties and obligations imposed on the Members as such shall be those set forth in this Agreement, which is intended to govern the relationship among the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

18.9 Reserved.

18.10 Rights and Remedies Cumulative.

The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

18.11 Severability.

If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law. Without limiting the generality of the foregoing sentence, to the extent that any provision of this Agreement is prohibited or ineffective under the Act or common law, this Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective under the Act or common law.