# EXHIBIT B
# (PART 3 OF 4)

18.12 <u>Heirs, Successors and Assigns</u>.

Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns.

18.13 <u>Creditors</u>.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

18.14 <u>Counterparts</u>.

This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

18.15 <u>Reserved</u>.

18.16 <u>Power of Attorney</u>.

Each Member hereby irrevocably makes, constitutes and appoints the Manager, with full power of substitution, so long as the Manager is acting in such a capacity (and any successor Manager thereof so long as such Manager is acting in such capacity), the Member's true and lawful attorney, in such Member's name, place and stead (it is expressly understood and intended that the grant of such power of attorney is coupled with an interest) to make, execute, sign, acknowledge, swear and file with respect to the Company:

(a)     all amendments of this Agreement adopted in accordance with the terms hereof;

(b)     all documents which the Manager deems necessary or desirable to effect the dissolution and termination of the Company;

(c)     all such other instruments, documents and certificates which may from time to time be required by the laws of the State of Nevada or any other jurisdiction in which the Company shall determine to do Business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the valid existence of the Company; and

CONFIDENTIAL

(d)   all instruments, documents and certificates which the Manager deems necessary or desirable in connection with a Reorganization which has been authorized in accordance with the terms of this Agreement.

This power of attorney shall not be affected by and shall survive the bankruptcy, insolvency, death, incompetency, or dissolution of a Member and shall survive the delivery of any assignment by the Member of the whole or any portion of the Member's Membership Interest. Each Member hereby releases the Manager from any liability or claim in connection with the exercise of the authority granted pursuant to this power of attorney, and in connection with any other action taken by the Manager pursuant to which the Manager purports to act as the attorney-in-fact for one or more Members, if the Manager believed in good faith that such action taken was consistent with the authority granted to it pursuant to this Section 18.16.

18.17  Investment Representations.

18.17.1     The Members, understand that:  (1) the Membership Interests evidenced by this Agreement have not been registered under the Securities Act of 1933, the State of Nevada Securities Act or any other state securities laws (the "Applicable Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the registration requirements of the Applicable Securities Acts providing for issuance of securities not involving a public offering; (2) the Company has relied upon the fact that the Membership Interests are to be held by each Member for investment; and (3) exemption from registrations under the Applicable Securities Acts would not be available if the Membership Interests were acquired by a Member with a view to distribution.

18.17.2     Accordingly, each Member hereby confirms to the Company that such Member is acquiring the Membership Interests for such own Member's account, for investment and not with a view to the Transfer or distribution thereof. Each Member agrees not to Transfer or offer for Transfer any portion of the Membership Interests unless there is an effective registration or other qualification relating thereto under the Securities Act of 1933 and under any applicable state securities laws or unless the holder of Membership Interests delivers to the Company an opinion of counsel, satisfactory to the Company, that such registration or other qualification under such Act and applicable state securities laws is not required in connection with such Transfer or offer for Transfer. Each Member understands that the Company is under no obligation to register the Membership Interests or to assist such Member in complying with any exemption from registration under the Applicable Securities Acts if such Member should, at a later date, wish to dispose of the Membership Interest. Furthermore, each Member realizes that the Membership Interests are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange

34

CONFIDENTIAL

Commission unless such Member is not an "affiliate" of the Company, within the meaning of such Rule 144, and the Membership Interest has been beneficially owned and fully paid for by such Member for at least three years.

18.17.3    Each Member, prior to acquiring a Membership Interest, has made an investigation of the Company and the Business, and the Company has made available to each Member, all information with respect to the Company which such Member needs to make an informed decision to acquire the Membership Interest. Each Member considers himself, herself or itself to be a person possessing experience and sophistication as an investor, which are adequate for the evaluation of the merits and risks of such Member's investment in the Membership Interest.

18.18   Representations and Warranties.

18.18.1    In General.  As of the date hereof, each of the Members hereby makes each of the representations and warranties applicable to such Member as set forth in this Section 18.18, and such warranties and representations shall survive the execution of this Agreement.

18.18.2    Representations and Warranties.  Each Member, to the extent applicable, hereby represents and warrants that:

18.18.2(a)    Due Incorporation or Formation; Authorization of Agreement.  Such Member is a corporation duly organized or a partnership or limited-liability company duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership or limited-liability company power and authority to own its property and carry on its business as owned and carried on at the Effective Date. Such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a Material Adverse Effect on its financial condition or its ability to perform its obligations hereunder. Such Member has the corporate, partnership or limited-liability company power and authority to execute and deliver this Agreement and to perform the Agreement's obligations hereunder and the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate, partnership or limited-liability company action. This Agreement constitutes the legal, valid, and binding obligation of such Member.

18.18.2(b)    No Conflict with Restrictions; No Default.  Neither the execution, delivery, and performance of this Agreement nor the

35

**CONFIDENTIAL**

consummation by such Member of the transactions contemplated hereby: (1) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator, applicable to such Member or any of the Member's Affiliates; (2) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the articles of incorporation, bylaws, partnership agreement, limited-liability company agreement or operating agreement of such Member or any of the Member's Affiliates or of any material agreement or instrument to which such Member or any of the Member's Affiliates is a party or by which such Member, or any of the Member's Affiliates is or may be bound or to which any of the Member's material properties or assets is subject; (3) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member or any of the Member's Affiliates is a party or by which such Member or any of its Affiliates is or may be bound; or (4) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member or any of its Affiliates.

18.18.2(c)   <u>Government Authorizations</u>.  Any registration, declaration, or filing with, or consent, approval, license, permit, or other authorization or order by, any government or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance, and performance by such Member under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made, or obtained on or before the effective date of this Agreement.

18.18.2(d)   <u>Litigation</u>.  There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Member or any of its Affiliates, threatened against or affecting such Member or any of its Affiliates or any of their properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, which if adversely determined could) reasonably be expected to materially impair such Member's ability to perform the Member's obligations under this Agreement or to have a

36

CONFIDENTIAL

Material Adverse Effect on the consolidated financial condition of such Member; and such Member or any of the Member's Affiliates has not received any currently effective notice of any default, and such Member or any of the Member's Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any arbitrator which could reasonably be expected to materially impair such Member's ability to perform the Member's obligations under this Agreement or to have a Material Adverse Effect on the consolidated financial condition of such Member.

18.18.2(e)   Investment Company Act; Public Utility Holding Company Act. Neither such Member nor any of the Member's Affiliates is, nor will the Company as a result of such Member holding a Membership Interest be, an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940. Neither such Member nor any of the Member's Affiliates is, nor will the Company as a result of such Member holding a Membership Interest be, a "holding company," "an affiliate of a holding company," or a "subsidiary of a holding company," as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

18.18.2(f)   Tax Status. The Members and the Manager agree that the Company shall be treated as a partnership, for federal income tax purposes, by default, pursuant to Regulation Section 301.7701-3(b), and they each agree not to take any action or make any election not consistent with such partnership classification.

## ARTICLE 19.
## SECURITIES MATTERS

19.1.  No Parole Reliance.

Each Member covenants that: (a) with respect to such Member, such respective Member has received various documentation and has engaged in various communications whereby the Business has been discussed and described, apart from this Agreement, prior to the Effective Date (the "Explanatory Communications") by and between Stephens and Net Sortie; (b) the Explanatory Communications were merely illustrative of the Business and in no manner is a representation, warranty or guarantee of performance or profitability nor may be used as a basis for an implied representation, warranty or guarantee of performance or profitability; (c) with respect to such Member, that such Member has performed such Member's own due diligence, investigation and analysis of the viability and/or non-viability of the Business and/or the Company in

37

acquiring the such Member's Membership Interests pursuant to this Agreement; (d) with respect to such Member, such Member has diligently reviewed the terms of this Agreement and has only relied upon the terms and provisions of this Agreement as the communication from the Company regarding the acquisition by such Member of such Member's Membership Interests; (e) with respect to such Member, that all documents, records, and books pertaining to the Company have been made available to such Member for inspection by the Member and /or the Member's advisor(s); and (f) with respect to such Member, such Member has had a reasonable opportunity to ask questions of, and receive answers from, the Company concerning such Member's acquisition of the Member's Membership Interests pursuant to this Agreement, and all such questions have been answered to the full satisfaction of such Member.  The Company hereby further makes available to the Members any and all books and records of the Company, upon reasonable notice, during reasonable business hours at the Principal Place of Business.

19.2.   Own Account.

Each Member hereby covenants, represents and warrants that the Member's Membership Interests are being purchased by the Member solely for the Member's own account and not for the account of any other Person nor with a view to, or for Transfer in connection with, any distribution, division, assignment, or resale to others, and that no other Person has a direct or indirect beneficial interest in the Member's Membership Interests.

19.3.   Accurate Information.

Each Member hereby covenants, represents and warrants that, with respect to such Member, all information which the Member has provided to the Company, whether by way of this Agreement or otherwise, concerning the Member's investor status, financial position, knowledge and experience in financial and business matters:

(a)     has been provided by the Member by representatives of the Member that are in a position within the Member to have adequate knowledge and experience in the Member's financial and business matters; and

(b)     is true, accurate and complete as of the Effective Date.

19.4.   Risk Factors Disclosure.

Each Member covenants that:

38

CONFIDENTIAL

(a)   the acquisition of such Member's respective Membership Interests involves highly speculative risks;

(b)   each Member, with respect to such Member, has the ability to accept highly speculative risks and is prepared to lose the entire investment in the Company;

(c)   as a start-up operation, there is a significant risk that the Company's perceived market receptivity to the proposed services will not be as substantial as in fact perceived;

(d)   the willingness of consumers to understand and agree to the assignment and license-back structure that is inherent in the Company's business structure may not be consistent or even prevalent;

(e)   as the Company becomes more successful, such success may actually reduce infringements and hence future revenue streams;

(f)   the successful pursuit of infringements can be heavily mitigated by the ability to recover funds from defendants that may not have adequate financial wherewithal to pay judgments or settlement fees;

(g)   many defendants may attempt to escape judgment and other defendants may escape civil prosecution; and

(h)   the Company is unable to preclude future, pure competitors from adopting the Company's business model and replicating the range of services offered by the Company and that these future competitors could attempt to undercut the Company's pricing structure and capture significant market share.

[SIGNATURE PAGE FOLLOWS]

39

CONFIDENTIAL

WHEREFORE, the parties hereto hereby executed this Agreement and that this Agreement is hereby adopted by the Members.

Right*haven* LLC,
a Nevada limited-liability company

By:  Net Sortie Systems, LLC, a Nevada
     limited-liability company, Manager

By:_____
     Steven A. Gibson, its Manager


MEMBERS:

Net Sortie Systems, LLC,
a Nevada limited-liability company


_____
     Steven A. Gibson, Esq.,
     Manager

---

SI Content Monitor LLC,
an Arkansas limited-liability company


By: _____
     Print Name

     _____
     Signature

Its: _____


40

CONFIDENTIAL

## SCHEDULE 1 - DEFINITIONS

The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein);

"Act" shall mean Chapter 86 of the Nevada Revised Statutes.

"Additional Offices" shall have the meaning ascribed to such term in Section 2.3.

"Affiliate" shall mean, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by, or under common control with such Person, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting interests of such Person, (iii) any officer, director, or general partner of such Person, or (iv) any Person who is an officer, director, general partner, trustee, or holder of ten percent (10%) or more of the voting interests of any Person described in clauses (i) through (iii) of this sentence.  For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of any such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

"Annual Meeting" shall have the meaning set forth in Section 8.1.

"Applicable Securities Acts" shall have the meaning set forth in Section 18.17.

"Article" shall mean an enumerated provision of this Agreement that may contain Sections.

"Articles of Organization" shall mean the Articles of Organization of the Company as filed with the Secretary of State of Nevada as the same may be amended from time to time.

"Budget" shall mean the expenditures approved by the Members at each respective Annual Meeting for the succeeding year, as possibly modified by the Members through action taken at Quarterly Meetings.

"Business" shall have the meaning set forth in Article 3.

"Business Day" shall mean any day, Monday through Friday, excepting Saturday and Sunday and also excepting any day on which federal chartered banks situated in Clark County, Nevada are generally not open for business.

CONFIDENTIAL

"Buy Notice" shall have the meaning set forth in Section 15.2.3.

"Buy Option" shall have the meaning set forth in Section 15.2.2.

"Buying Member" shall have the meaning set forth in Section 15.2.2.

"CAO" shall have the meaning set forth in Section 6.6.

"Calculation Quarter" shall mean the last full Quarter that precedes a given Distribution Meeting.

"Candidates" shall have the meaning set forth in Section 5.9.

"Capital Account" as of any given date shall mean the Capital Account of each Member as described in Section 9.2 and maintained to such date in accordance with this Agreement.

"Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

"Causes of Action" shall mean any demand, complaint, request for redress, assertion of a cause of action or other claim whatsoever.

"CEO" shall have the meaning set forth in Section 6.2.

"Change of Control" shall mean any circumstance, event or occurrence whereby Control passes from one Person (or if more than one Person maintains Control, several Persons) to one or more other Persons.

"Changed Member" shall have the meaning set forth in Section 15.5.

"Claim" shall mean any claim, demand, action, suit, institution of any legal or quasi-legal proceeding of any nature whatsoever.

"Claimant" shall have the meaning set forth in Section 5.8.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Company" shall have the meaning set forth in the initial paragraph of this Agreement.

"Company Identified Infringements" shall have the meaning set forth in Section 3.2 (c).

CONFIDENTIAL

"Company Intellectual Property" shall mean the Intellectual Property owned, Developed, held, used or licensed by Company.

"Company Property" shall mean all assets (real or personal, tangible or intangible, including cash) of the Company.

"Company Trade Secrets" shall mean Trade Secrets owned, Developed, held, used or licensed by Company, including, without limitation, the Methods.

"Competitive Activities" shall have the meaning set forth in Section 12.6.

"Confidential Information" shall mean all the Content that is the subject of the Assignment and all Content relating to, used in or arising out of the Business, finances or other operations and held by, owned, Developed, licensed, or otherwise possessed by the Company (whether held by, owned, Developed, licensed, possessed or otherwise existing in, on or about Company's premises or a Member's offices, residence(s) or facilities, including, without limitation, the Principal Place of Business, and regardless of how such Content came into being, as well as regardless of who Developed, created, generated or gathered the Content), including, without limitation, all Content contained in, embodied in (in any Media whatsoever) or relating to Company's ideas, creations, works of authorship, works of visual art, Business documents, contracts, licenses, Business and non-Business relationships, correspondence, operations, manuals, performance manuals, operating data, projections, bulletins, supplier and customer lists and data, Transfers data, cost data, profit data, strategic planning data, financial planning data, designs, logos, motifs, proposed trademarks or service marks, test results, product or service literature, product or service concepts, manufacturing or Transfers techniques, process data, specification data, know-how, show-how, Software, databases, research and development information and data; provided, however, that "Confidential Information" shall not include information or data "generally publicly known." The phrase in the previous sentence "generally publicly known" shall not be deemed to include the Content set forth in patents despite the fact that patents have been published by the federal government, unless such embodiment has otherwise been the subject of a publication for general public consumption (other than publication as a patent) or if that embodiment is otherwise utilized generally by Persons in the United States of America while Transferring products or services within the scope of the Maintenance, Repair or Renovation industries. All references to "Confidential Information" in this Agreement shall be deemed to also refer to "Company Trade Secrets" as well, but references to "Company Trade Secrets" shall not be deemed to automatically refer to "Confidential Information."

"Content" shall mean all material, information, matter, text, data, graphics, Documents, computer-generated displays and interfaces, images, photographs and works of whatsoever nature, including without limitation all compilations of the foregoing and all

CONFIDENTIAL

results of the expression of the foregoing whether in a format now known or hereinafter Developed.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, or the power to veto major policy decisions of any such Person, whether through the ownership of voting securities, by contract, or otherwise.

"COO" shall have the meaning set forth in Section 6.4.

"Deadlock" shall mean the circumstance whereby a determination, by way of voting, by the Members is required by the provisions of this Agreement but said voting does not result in an ascertainable conclusion because of the non-occurrence of a simple Majority Vote to be reached or, where specifically required by this Agreement, a failure of an affirmative vote of the Members holding at least a Super-Majority Interest to be reached.

"Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"Develop" shall mean develop, conceive, discover, reduce to practice, create, or otherwise arise out of a Person's efforts in any manner whatsoever and through any means whether now known or hereafter developed.

"Disclose" shall mean disclose, disseminate, transmit, publish, distribute, make available or otherwise convey.

"Distributable Cash" shall mean all cash possessed by the Company (other than cash that exists as a result of any Capital Contribution) on the last day of the Calculation Quarter with respect to a particular, respective Distribution Meeting minus both of the following:  (a) the Total Reserve with respect to the Quarter succeeding said, respective Calculation Quarter, and (b) an amount equal to the account payables of the Company due and owing on the last day of the respective Calculation Quarter.

CONFIDENTIAL

"Distribution" shall mean the amount of Distributable Cash determined by the Members at each respective Distribution Meeting to be disbursed to the Members in accordance with the procedure set forth in Section 11.2.

"Distribution Meeting" shall mean each and every Quarterly Meeting and each and every Annual Meeting.

"Document" shall mean any form of tangible Media containing Content capable of being reduced to electronic form and reconstituted in tangible form.

"Economic Interest" shall mean a Member's share of one or more of the Profits, Losses and Distributions pursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or the Manager.

"Effective Date" shall have the meaning set forth in the Introductory Clause.

"Entity" shall mean any general partnership, limited partnership, limited-liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Explanatory Communications" shall have the meaning set forth in Section 19.1.

"Exploit" shall mean to use, make, Transfer or otherwise exploit in any manner whatsoever (through any means now known or hereafter Developed).

"Fiscal Year" shall mean the calendar year or any partial calendar year in which the Company conducts Business operations.

"Focus" shall have the meaning set forth in Section 3.2.

"Gift" shall mean a gift, bequest, or other transfer for no consideration, whether or not by operation of law, except in the case of bankruptcy.

"Gifting Member" shall mean any Member who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

> (a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined

S-5

**CONFIDENTIAL**

by the contributing Member and the Manager, provided that the initial Gross Asset Values of the assets contributed to the Company pursuant to Section 11.13.1 hereof shall be as set forth in Exhibit 9.1, and provided further that, if the contributing Member is a Manager, the determination of the fair market value of any other contributed asset shall require the consent of the other Members holding at least a Super-Majority Interest (determined without regard to the Voting Interest of such contributing Member);

(b)     The Gross Asset Values of all Company Property shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Manager as of the following times: (i) the acquisition of an additional interest by any new or existing Member in exchange for more than a *de minimis* contribution of property (including money); (ii) the Distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for a Membership Interest; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Gross Asset Value of any Company asset Distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of Distribution as reasonably determined by the distributee and the Manager, provided that, if the distributee is a Manager, the determination of the fair market value of the Distributed asset shall require the consent of the other Members holding at least a Super-Majority Interest (determined without regard to the Voting Interest of the distributee Member); and

(d)     The Gross Asset Values of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and Section 9.3 and subparagraph (d) under the definition of Profits and Losses; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (d) of this definition to the extent that the Manager determines that an adjustment pursuant to subparagraph (b) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (a), (b) or (d) of this definition, then such Gross Asset Value shall

CONFIDENTIAL

thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Highest Aggregate Rank" shall have the meaning set forth in Section 5.9.

"Highest Ranked Matches" shall have the meaning set forth in Section 5.9.

"Identified Infringements" shall have the meaning set forth in Section 3.2 (c).

"Initial Capital Contribution" shall have the meaning set forth in Section 9.1.

"Intellectual Property" shall mean all foreign, federal, state and common law trademarks, service marks, domain names, Internet path names and addresses of whatsoever nature, trade dress, copyrights, know-how, show-how, patents, inventions, (whether or not patentable) mask works, Software, proprietary data, customer lists, strategic plans, financial data, Trade Secrets, all other intangible assets of whatsoever nature and all applications for registration and/or issuance with respect to all the foregoing and whether or not any of the foregoing is registerable or patentable, including, without limitation, with respect to all of the foregoing:  (a) all goodwill associated with any and all of the foregoing, (b) all parents, continuations, continuations in part, divisionals, reissues and extensions, and (c) all moral rights associated with any and all of the foregoing.

"Interim Manager" shall have the meaning set forth in Section 5.8.

"Internet" shall mean the largest set of computer based networks now known, as interconnected by routers.

"Laws" shall mean all laws, statutes, rules, regulations, ordinances, and other pronouncements having the effort of law of the United States or any state, county, city, possession or other political subdivision of any Government Authority.

"Majority Vote" shall mean one or more Voting Interests of the Members, which, taken together exceed fifty percent (50%) of the aggregate of all Voting Interests.

"Manager" shall have the meaning set forth in Section 5.1.

"Managers List" shall have the meaning set forth in Section 5.9.

"Mark Licensees" shall have the meaning set forth in Section 3.2 (f).

"Match" shall have the meaning set forth in Section 5.9.

S-7

CONFIDENTIAL

"Material Adverse Effect" shall mean reasonable anticipation that the net worth of the Company would be reduced by more than five percent (5%) or such net worth is, in fact, reduced by more than five percent (5%).

"Media" shall mean television, telephony, radio, satellite, cable, wire, computer-based network, network, magnetic means, electronic means, Internet, intranet, print means, optical means and any other method (now known or hereinafter devised, invented or created) for the publication of Content, including without limitation, computer software, compact and laser disc, digital video displays, video cassettes, and multi-media means.

"Member" shall mean each of the parties who executes a counterpart of this Agreement as a member ("Member").

"Member Meeting" shall mean each, any and all Quarterly Meetings, Annual Meetings and/or Special Meetings.

"Membership Interest" shall mean a Member's ownership interest in the Company expressed as a percentage in relation to all other Members' ownership interest in the Company.

"Misconduct" shall have the meaning set forth in Section 5.8.

"Misconduct Arbitration Proceedings" shall have the meaning set forth in Section 5.8.

"Net Sortie" shall have the meaning set forth in the initial paragraph of this Agreement.

"Non-Cash Consideration" shall have the meaning set forth in Section 15.2.1.

"Non-Changing Member" shall have the meaning set forth in Section 15.5.

"Non-Executive Reserve" shall mean, with respect to a time period as expressed in this Agreement that also expressly references this defined term in a provision of this Agreement (each a "Non-Executive Reserve Relevant Time Period"), an amount of cash equal to the total expenditures for three (3) months as set forth on the Budget that is controlling for each such respective Non-Executive Reserve Relevant Time Period minus salaries to the CEO and the COO.

"Notice" shall have the meaning set forth in Section 18.1.

"Notice of Transfer" shall have the meaning set forth in Section 15.2.1.

"Officer" shall mean the CEO, the COO, the CAO as well as any other employee of the Company who is the subject of an Officer Notice pursuant to Section 5.2(n).

S-8

CONFIDENTIAL

"Officer Misconduct" shall have the meaning set forth in Section 6.1.

"Officer Notice" shall have the meaning ascribed to such term in Section 5.2(n).

"Offered Interest" shall have the meaning set forth in Section 15.2.1.

"Option Period" shall have the meaning set forth in Section 15.2.2.

"Participation Notice" shall have the meaning set forth in Section 15.2.2

"Participation Options" shall have the meaning set forth in Section 15.2.2.

"Period of Arbitration" shall have the meaning set forth in Section 5.8.

"Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Pledge" shall have the meaning set forth in Section 5.3(a).

"Principal Place of Business" shall have the meaning ascribed to such term in Section 2.3.

"Profits" and "Losses" shall mean for each Fiscal Year, or other applicable period, of the Company an amount equal to the Company's net taxable income or loss for such year as determined for federal income tax purposes (including separately stated items) in accordance with the accounting method and rules used by the Company, subject to the capital account maintenance rules set forth in Section 1.704-1(b)(2)(iv) of the Regulations, and in accordance with Section 703 of the Code, with and including the following adjustments:

      (a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be added to such taxable income or loss;

      (b)    Any expenditure of the Company described in Section 705(a)(2)(B) of the Code and not otherwise taken into account in computing Profits and Losses (pursuant to this definition) shall be subtracted from such taxable income or loss;

      (c)    In the event the Gross Asset Value of any Company asset is adjusted pursuant to subparagraphs (b) or (c) of the definition of Gross Asset

S-9

CONFIDENTIAL

Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(d)    Gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year; and

(f)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations to be taken into account in determining Capital Accounts as a result of a Distribution other than in liquidation of a Membership Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits and Losses.

"Proposed Budget" shall mean the proposed annual expenditures by the Company for the succeeding year proposed by the Manager to the Members for consideration at each respective Annual Meeting.

"Purchase Price" shall have the meaning set forth in Section 15.2.1.

"Quarterly Meeting" shall have the meaning set forth in Section 8.2.

"Regulations" shall include proposed, temporary and final regulations promulgated under the Code in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations in their application to the Company.

"Remainder" shall have the meaning set forth in Section 17.3(a).

"Remaining Members" shall have the meaning set forth in Section 15.2.1.

"Removal Deadlock" shall have the meaning set forth in Section 5.8.

"Reorganization" shall mean the merger or conversion of the Company, or a Transfer or other disposition of assets of the Company, or Transfer or other disposition of

S-10

CONFIDENTIAL