SHAWN A. MANGANO, ESQ.
Nevada Bar No. 6730
shawn@manganolaw.com
SHAWN A. MANGANO, LTD.
8367 West Flamingo Road, Suite 100
Las Vegas, Nevada 89147
(702) 683-4788 – telephone
(702) 922-3851 – facsimile

*Attorney for Righthaven LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| RIGHTHAVEN LLC, a Nevada limited-liability company,<br><br>             Plaintiff,<br><br>v.<br><br>THOMAS A. DIBIASE, an individual,<br><br>             Defendant.<br><br>AND RELATED COUNTERCLAIM | Case No.: 2:10-cv-01343-RLH-PAL<br><br>**DECLARATION OF SHAWN A. MANGANO IN SUPPORT OF RIGHTHAVEN LLC'S RESPONSE TO ORDER TO SHOW CAUSE** |

     I, SHAWN A. MANGANO, declare, under penalty of perjury, that the following is true and correct:

     1.     I am currently counsel of record for Plaintiff Righthaven LLC ("Righthaven") n this matter. I have personal knowledge of the facts set forth herein, except for those statements made upon information and belief, and as to those facts, I believe them to be true.  I am over eighteen years old and I am competent to testify to the matters set forth herein.

     2.     This declaration is submitted in support of Righthaven LLC's Response to Order Show Cause. The Court issued the Order to Show Cause on September 18, 2012 to which Righthaven is filing its response.

3. I intend to withdraw as counsel of record for Righthaven in this matter. I also intend to do so in at least one other pending action involving Righthaven.

4. The gravamen of Righthaven's alleged non-compliance relates to the terms of a February 6, 2012 stipulation (the "February Stipulation") entered into by the parties.

5. At the time the February Stipulation was entered into between the parties, Righthaven had ceased to exist as a going concern. Facing numerous adverse subject matter jurisdiction decisions in the District of Nevada and elsewhere, Righthaven had been forced to suspend its copyright enforcement efforts while review was sought on appeal. The company was also facing judgment enforcement efforts from an attorneys' fees award issued in *Righthaven, LLC v. Hoehn,* No. 2:11-cv-00050-PMP-RJJ ("*Hoehn*").

6. On December 12, 2011, a receiver had been appointed over the company in *Hoehn* to seize and liquidate all of its tangible and intangible assets. Righthaven no longer employed anyone. It had been forced to move offices twice while it challenged the attorneys' fees award and the appointment of the receiver in *Hoehn* multiple times before the district court and the Ninth Circuit. These efforts failed.

7. Sometime in January 2012, the company relinquished its minimal office space and set up a "virtual" office, which merely consisted of an Internet maintained e-mail account that did not require maintenance through a physical server.

8. After relinquishing its office space, all of Righthaven's electronically stored information became inaccessible. The company's computer server, several desktop computers and a couple of printers were placed in storage. A few of chairs and some file boxes containing litigation materials were also placed in storage. Righthaven did not maintain hard copy documentation for its accounting and operational records, but was instead apparently accessed electronically.

9. In early January 2012, judgment debtor examinations of Steven A. Gibson ("Mr. Gibson") and Raisha Gibson ("Mrs. Gibson"), both of whom served as company officers, were conducted in *Hoehn*.

10. As part of these examinations, counsel for Mr. Hoehn had requested that Righthaven produce numerous documents concerning its financial affairs and operations. On behalf of Righthaven I advised Mr. Hoehn's counsel that it could not do so because virtually all potentially responsive information was stored on its inoperative computer server or associated desktop computers. Moreover, I conveyed that Righthaven did not have the financial resources to make this information accessible. I did advise, however, that the company managed to access detailed banking records that showed all checks that had been issued, electronic transactions it had undertaken and deposits made since its inception. I produced these records to Mr. Hoehn's counsel prior to the judgment debtor examinations. In doing so, I advised Mr. Hoehn's counsel that the information contained in these banking records mirrored that which would be reflected in the company's electronically inaccessible records.

11. At the time Mr. and Mrs. Gibson's judgment debtor examinations occurred, Righthaven was awaiting a ruling by the Ninth Circuit on an emergency request for a stay pending appeal of the *Hoehn* judgment.

12. The intent underlying the February Stipulation was to avoid the need for conducting a second round of judgment debtor examinations of Mr. Gibson and Mrs. Gibson. The understanding between the parties was to allow Mr. DiBiase's counsel to review the transcript from Mr. and Mrs. Gibson's judgment debtor examinations in *Hoehn* and then advise whether or not additional testimony would be required.

13. I did not have the court reporter's contact information and I did not know the reporting agency with which she was associated. I believed Mr. Hoehn's counsel had ordered transcripts of the examinations. It was expressly understood between the parties that I would attempt to secure copies of the transcripts from Mr. Hoehn's counsel because the company lacked the financial resources to acquire them independently.

14. The February Stipulation also required Righthaven to produce numerous categories of documents and other material. At the time the February Stipulation was discussed, I expressly advised Mr. DiBiase's counsel that the company did not have access to virtually any responsive materials. I further advised that all of the company's records were believed to be

stored on its disconnected and inaccessible server or potentially on one or more inoperable desktop computers.

15. I informed Mr. DiBiase's counsel that Righthaven did not have the funds necessary to recreate its computer network so that it could access and identify materials potentially responsive to Mr. DiBiase's requests.

16. I also told Mr. DiBiase's counsel that Righthaven could produce the same banking records it had provided to Mr. Hoehn's counsel, which was believed to be fairly comprehensive. Under no circumstances did I lead Mr. DiBiase's counsel to believe that the company had access to other responsive materials. This conclusion was based in part on the fact that I was familiar with a similar search that had recently been undertaken in response to the document requests made in the *Hoehn* matter.

17. As the primary client representative, Mr. Gibson was fully apprised by me of the foregoing discussions with Mr. DiBiase's counsel and he expressly authorized me to enter into the February Stipulation.

18. Shortly after the February Stipulation was entered, the Ninth Circuit denied Righthaven's final stay request. Upon receipt of this decision, Mr. Hoehn's counsel and the receiver increased their judgment enforcement efforts. The receiver proceeded to exercise control over all company property – both tangible and intangible. I was threatened with sanctions if I did not comply with the receiver's requests.

19. My relationship with Mr. Gibson started to deteriorate after the Ninth Circuit denied Righthaven's final stay request.  Mr. Gibson continued demanding that I challenge the receiver's authority and the district court's power to appoint her. I also believed I was obligated to abide by the order appointing the receiver and which granted her considerable latitude in performing her duties. Eventually the receiver fired Mr. and Mrs. Gibson from their positions with Righthaven. The receiver also independently engaged counsel on behalf of the company to dismiss its pending appeals.

20. By the end of February 2012, the receiver had exercised control over Righthaven's assets. The desktop computers and server, minus any internal storage devices, were

now under her control. The copyright registrations were judicially transferred to her possession. She had seized and sold company's domain name at auction. All of these events appeared to be inevitable to me after the Ninth Circuit denied Righthaven's stay efforts.

21.     Mr. DiBiase's counsel was fully aware that the receiver was dismantling Righthaven after its final stay request was denied. Sometime in late February 2012, I advised Mr. DiBiase's counsel that several unsuccessful inquiries had been made to Mr. Hoehn's counsel about obtaining the judgment debtor examination transcripts. I further advised Mr. DiBiase's counsel that I had no way of contacting either the court reporter or the court reporting agency because I did not know their identity. I additionally informed Mr. DiBiase's counsel that Righthaven lacked the funds necessary to obtain the transcripts if either the reporter's identity or the agency's name could be identified. I also told Mr. DiBiase's counsel that the company had no money and that all of its assets, tangible and intangible, were now controlled by the receiver.

22.     During our conversation, Mr. DiBiase's counsel appreciated the gravity and futility of the situation in any judgment enforcement efforts. Moreover, he was aware that a receiver was in place to seize and liquidate assets for distribution to creditors such as Mr. DiBiase.

23.     From February 23, 2012 to September 25, 2012, I do not recall receiving any communications from Mr. DiBiase's counsel concerning this matter or compliance with the February Stipulation.

24.     Beginning in mid-February 2012, I began experiencing some significant personal issues that required immediate attention. My seventy-eight year old mother, who is my only living parent, began experiencing life threatening health conditions.

25.     Over the next several months, counsel's mother has been repeatedly hospitalized for cardiac-related conditions. During this time, and continuing to the present, I have been required to travel to Southern California on short notice and often for several weeks to care for my mother. These events have caused an enormous emotional strain on me. These circumstances have also significantly impacted my legal practice. For instance, I have been forced to have other attorneys appear at hearings for me and I have needed to tell opposing counsel when my

mother's condition has unexpectedly required me to leave the jurisdiction before a scheduled appearance.

26. Through all of these unfortunate events, I believed compliance with the February Stipulation was a moot issue. Whatever tangible and intangible assets Righthaven had were now property of the receiver. The debtor examination transcripts could not be obtained despite my efforts to do so. The receiver had fired Mr. and Mrs. Gibson from their positions with the company. New counsel had also been hired to dismiss the company's pending appeals. Moreover, I do not recall having received any communications from Mr. DiBiase's counsel during a six-month time span. In essence, I believed that any issues concerning the company were either being addressed by the receiver or had been abandoned as futile given the circumstances.

27. I never intended to deprive Mr. DiBiase or his counsel of any materials that Righthaven had within its possession or that could be reasonably accessed by it. In fact, I fully informed Mr. DiBiase's counsel about the futility of seeking the requested materials given the company's overall state of affairs before entering into the February Stipulation.

28. I have not been paid pursuant to the terms of my firm's engagement agreement with Righthaven for approximately ten months. I have not been paid for any services pursuant to the terms of my firm's engagement agreement with Righthaven since approximately February 2012. Mr. DiBiase's counsel was told by be me that I was not being paid by Righthaven for my services for approximately seven or eight months.

29. Mr. Gibson unquestionably authorized me to enter into the February Stipulation. I apprised Mr. Gibson of all meaningful litigation decisions and he actively participated in them. The February Stipulation was one such event.

30. Mr. Gibson, as well as his wife, had undergone the inconvenience of a judgment debtor's examination in the *Hoehn* matter. They wanted to avoid undergoing the same inconvenience in this case.

31. Mr. Gibson further understood the nature of materials being requested as part of the proposed stipulation because I went through the delineated categories with him during a

telephone call before entering into the stipulation. In response, Mr. Gibson indicated that he did not have any responsive materials accessible to him beyond the bank records previously provided in connection with the *Hoehn* judgment debtor examinations. Mr. Gibson then authorized counsel to enter into the February Stipulation on behalf of Righthaven.

32. I admit to not filing declaration required under the February Stipulation that detailed the costs and efforts explored for Righthaven to access electronically stored information. I did, however, discuss these circumstances with Mr. DiBiase's counsel during one or more telephone conversations. These conversations relayed that Righthaven did not have the financial resources necessary to reestablish its network in any capacity and that it would cost at least a couple of thousand dollars to do so. Moreover, I advised that following the denial of Righthaven's final stay application, the receiver was asserting control over the server and the desktop computers along with other company property.

33. I used my best efforts to obtain the judgment debtor examination transcripts from Mr. Hoehn's counsel who conducted the examinations. Multiple requests were made of Mr. Hoehn's counsel, which included asking for the court reporter's identity or the company with whom she was employed. These efforts proved fruitless.

34. I advised Mr. DiBiase's counsel my unsuccessful efforts to secure copies of the transcripts. In fact, Mr. DiBiase's counsel has since admitted to me that he learned from Mr. Hoehn's counsel that transcripts from the judgment debtor examinations were never ordered.

35. With regard to the production of materials called for under the February Stipulation, I inquired with Mr. Gibson as to whether or not he was in possession of any responsive documents. I did this by telephonically conferring with Mr. Gibson at the same time I sought authorization to enter into the February Stipulation.

36. During our telephone call I read off the list of requested materials to Mr. Gibson. In response, Mr. Gibson indicated that except for the bank records previously produced in connection with the judgment debtor examinations in the *Hoehn* matter he was not in possession of any responsive materials. Mr. Gibson speculated that some responsive materials were possibly stored in electronic format on the company's inoperative computer server. While Mr. Gibson

7

believed it was unlikely any responsive materials were stored on the desktop computer hard drives, he could not definitively rule out this possibility.

37.     After Mr. Gibson approved the February Stipulation, I informed Mr. DiBiase's counsel that Righthaven did not possess any responsive materials beyond the bank records it had produced in *Hoehn*. I also advised Mr. DiBiase's counsel that it was unclear what responsive materials were electronically stored on the company's inoperative server and desktop computer hard drives. As set forth in the February Stipulation, counsel agreed that he would attempt to secure an estimate for making the server and desktop computer hard drives operative.

38.     During Mr. Gibson's judgment debtor examination, counsel for Mr. Hoehn requested an order compelling Righthaven to surrender its server and desktop computers. Righthaven's counsel objected to doing so because attorney-client privileged materials and potentially discoverable information related to on-going litigation were likely stored on this equipment. As a result, Magistrate Johnston authorized Righthaven to remove all hard drives and storage devices from the server and desktop computers. (*Hoehn,* No. 2:11-cv-00050-PMP-RJJ (Doc. # 77)).

39.     While I was attempting to obtain the judgment debtor examination transcripts and while I was securing the estimate for making the server and desktop computers operational, my mother was hospitalized in Southern California. Upon learning of her condition, I immediately left the jurisdiction to be by her bedside. I stayed in Southern California for over two and a half weeks to help her recuperate from heart surgery.

40.     During this time, I inquired about what was needed to make the server and the desktop computers operational. It was estimated to cost between $2,000 and $2,500 to do so. While I obtained this information, I failed to prepare a declaration detailing my efforts, the amount of the estimate that was obtained and the fact that the server and desktop computers were inoperable. This information was certainly known to Mr. DiBiase's counsel based on my conversations with him. Although it does not excuse my failure to prepare the declaration required under the February Stipulation, I was under a tremendous amount of stress dealing with my mother's unfortunate condition.

41. I provided Mr. DiBiase's counsel with all of the materials that were produced to Mr. Hoehn's counsel in connection with the judgment debtor examinations. These materials consisted of bank records that had been redacted and scanned into PDF format. Mr. DiBiase's counsel was provided these materials in the exact same format in which they were provided to Mr. Hoehn's counsel.

42. When I spoke to Mr. DiBiase's counsel shortly after producing these materials, Mr. DiBiase's counsel stated that he had already obtained unredacted copies of the company's bank records in response to a subpoena. He was appreciative for having received these materials from me, but he did not need them. Nevertheless, I caused Righthaven to fully comply with this aspect of the February Stipulation by producing the exact same materials that were provided to Mr. Hoehn's counsel.

43. Righthaven did not hire the court reporter used to transcribe the examinations. Mr. Hoehn's counsel did so. In an attempt to comply with the February Stipulation's requirements, I tried several times to obtain copies of the transcripts from Mr. Hoehn's counsel. Mr. Hoehn's counsel initially stated to me that he had not received copies of the transcripts and agreed to inform Mr. DiBiase's counsel of this fact because I was at with my ailing mother.

44. I also tried to obtain the name of the court reporter hired to transcribe the examinations, but my efforts in this regard failed. I advised Mr. DiBiase's counsel of the difficulties I was experiencing in attempting to secure the deposition transcripts. I did the best I could to obtain the transcripts under the circumstances, but Mr. Hoehn's counsel never ordered copies. Moreover, no one knew the name of the assigned court reporter or her company.

45. With regard to Righthaven's failure to produce the other materials identified in the February Stipulation, I know that Mr. and Mrs. Gibson performed a search for responsive hard copy documents. They did not locate any responsive documents in their search. Rather, Mr. Gibson informed me that he believed any potentially responsive materials were stored on the company's inoperable server and possibly one or more of the desktop computers located in storage.

46. From the time the February Stipulation was first discussed between the parties, the inoperability of Righthaven's server and desktop computers was fully disclosed. The company no longer had funds to maintain an office. Its chairs, some miscellaneous litigation files, the server and the desktop computers were placed into storage. The receiver had asserted ownership over these items, but Righthaven was authorized by Judge Johnston to remove the hard drives from the server and the desktop computers before surrendering them.

47. I apprised Mr. DiBiase's counsel of the foregoing facts. I also told Mr. DiBiase's counsel that Righthaven could not afford to make its server and computer desktops operational, which was estimated to cost between $2,000 and $2,500.

48. To the best of my knowledge, Righthaven is no longer a going concern and it has not been for several months. Any money it had in a company bank account was executed against by Mr. Hoehn's counsel months ago. I believe the company is penniless today.

49. The receiver has auctioned off Righthaven's domain name. Its copyrights have been surrendered to the receiver through court order. The receiver has taken control over the few tangible items of property owned by the company. The receiver has fired Mr. and Mrs. Gibson from their positions with Righthaven. Righthaven's pending appeals have been dismissed at the receiver's direction.

50. Righthaven has produced its bank records to Mr. DiBiase's counsel and Mr. Hoehn's counsel. The financial institutions formally used by Righthaven have also produced the company's bank records.

51. Caring for a sole surviving parent has not been easy. It has also been financially burdensome on me during these months because I have found it difficult to maintain a legal practice under such trying circumstances.

52. Continuing to monitor the activity in vast number of Righthaven cases without compensation since early 2012, while often being conflicted between Mr. Gibson's and the receiver's directives, has only added to my burdens.

53.     All of Righthaven's staff attorneys left the company over at least ten months ago. Many former company attorneys have been used as scapegoats to mitigate the responsibility of decisions made by others.

54.     Over the course of representing Righthaven I have been subjected to repeated physical threats, faced multiple motions for sanctions, endured the criticism of several judges and has had his professional competence and judgment questioned on numerous occasions in publicly filed documents. Often these filings have been widely reported through news media and Internet blogs.

55.     In over 14 years of practice in the State of Nevada, I have never, and would never, disrespect or intentionally ignore an order, hearing or mandate from this Court. Mistakes have been made for which I accept full responsibility. I certainly did not make these mistakes intentionally.

Signed and affirmed this 2nd day of October under the penalty of perjury.


/s/ Shawn A. Mangano_____
Shawn A. Mangano

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on this 2nd day of October 2012, I caused a copy of the foregoing document to be served by the Court's CM/ECF system.

SHAWN A. MANGANO, LTD.

By: /s/ Shawn A. Mangano
SHAWN A. MANGANO, ESQ.
Nevada Bar No. 6730
shawn@manganolaw.com
8367 West Flamingo Road, Suite 100
Las Vegas, Nevada 89147
Tel: (702) 683-4788
Fax: (702) 922-3851